161 N.J. Super. 84 (1978)
390 A.2d 1202
JAMES H. MIDDLEKAUFF, PLAINTIFF-RESPONDENT,
v.
CLAIRE T. MIDDLEKAUFF, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1978.
Decided July 21, 1978.
*86 Before Judges LORA, SEIDMAN and MILMED.
Ms. Alice Meyer argued the cause for defendant-appellant (Meyer and Scharff, attorneys; Ms. Meyer on the brief).
Mr. Steven M. Honig argued the cause for plaintiff-respondent (Honig and Honig, attorneys; Mr. Steven M. Honig on the brief).
Ms. Pamela C. Kaufelt argued the cause for amici curiae American Civil Liberties Union, National Organization for Women and Organization of Women for Legal Awareness.
The opinion of the court was delivered by MILMED, J.A.D.
The central issue in this matrimonial suit involves the defendant-wife's proposed removal from Wyckoff to Manhattan of the two children of the marriage, boys now of the ages of about 15 and 9 years respectively,[1] *87 for a limited period while she pursues graduate study there at the New School for Social Research leading to a master's degree in health services administration.
The record before us discloses that the parties were married in 1960, separated in 1975, and divorced in 1977 on "no-fault" grounds. In accord with their "Settlement Agreement," custody of the children was awarded to the wife, and the terms of the agreement were incorporated by reference in the judgment of divorce. Other pertinent provisions of the agreement include: the grant of visitation rights to plaintiff-husband; provision for the support and maintenance of the wife[2] and children, recognizing therein the possibility that the wife might be accepted in the New School graduate program in public health administration; and allowing the wife to continue to reside in the marital residence in Wyckoff. The wife was to pay all costs and charges in connection with the upkeep of the premises. Three provisions of the agreement relating to the marital premises became the subject of dispute in conjunction with the wife's intended temporary relocation in Manhattan while she pursued her graduate study. The relevant text reads:
The Husband and Wife are owners, as tenants by the entirety, of residential premises known as 350 Monroe Avenue, Wyckoff, New Jersey. The Wife may continue to reside in said premises until the parties may mutually agree, in writing, which agreement shall not be unreasonably withheld; or until the youngest child of the marriage *88 then living reaches the age of 18 years, or the Wife remarries, whichever shall first occur. At said time, the parties agree that they will cooperate to effect a sale of the property at a reasonable price, and shall execute all such deeds or other instruments as are necessary to effect such sale. * * * [Par. 4.2]
The Husband and Wife are hereby given, at any time, the first option to purchase the other's interest in the marital premises, at a price to be determined by an independent appraisal of the premises, less the parties' joint responsibilities in the mortgages, indentures and closing costs then secured against the marital premises. [Par. 4.3]

* * * * * * * *
The Wife represents that she will maintain the marital premises and not allow waste during the period of joint ownership with the Husband, and she shall have all right, title and interest in and to any rents received from said marital premises during her period of occupancy. [Par. 4.6]
Subsequently, Mrs. Middlekauff was accepted into the New School graduate program. To help finance her studies and enable her "to keep closer track of what the boys are doing" she began making arrangements to rent out the Wyckoff residence for a term of two years and move with the children into an apartment in a housing complex in Manhattan on Second Avenue between 26th and 29th Streets. The older son was accepted at Stuyvesant High School, which is within walking distance of the apartment, and the younger son was to attend a neighborhood elementary school. However, on plaintiff's motion, and after a hearing, the trial judge found that although the children "could be supervised * * * while [defendant is] in school" and "the area that she contends [sic] to move into is a fine area," to allow her to rent out the Wyckoff residence and temporarily move to Manhattan with the children would frustrate the intent of the parties as expressed in their settlement agreement "where they agreed that she should reside in * * * the residence * * * with the children, until one of the contingencies in [paragraph] 4.6 materializes." By an order of July 18, 1977 he, accordingly, enjoined defendant "from removing herself from the jurisdiction" of the court "under any *89 circumstances," without the court's approval or order, and restrained her "from renting the marital premises." He also denied her cross-motion "for payment of her counsel fees on account of plaintiff's motion," as well as plaintiff's application for temporary custody of the children.
Mrs. Middlekauff appealed from the provisions of the order that were adverse to her and applied to this court for emergent relief "dissolving the restraint" against removing herself from the court's jurisdiction. On August 12, 1977 this court disposed of that application by, in effect, lifting the restraint against her leaving New Jersey, but providing that the children could not be removed from the State without an order of the trial court.
Defendant thereupon obtained an order for a plenary hearing on the issues of: (1) allowing her temporarily to remove the children from the jurisdiction; (2) allowing her to rent or sell the Wyckoff residence "or purchase same from Plaintiff as provided in the Settlement Agreement," and (3) allowing her counsel fees and costs "for litigating these issues." After hearing both parties and a probation officer, another trial judge, although expressing admiration for Mrs. Middlekauff and her ambitions, found that "it was the general intention of the parties that [she] should remain in Wyckoff with the children," and concluded that it would not be "as conducive to the welfare of the children" for them to live in Manhattan as it would be for them to remain where they were. He announced that he would "sign an order directing Mrs. Middlekauff to remain in Wyckoff." He subsequently ordered that (1) "the August 12, 1977 Order of the Appellate Division shall remain in force until further order of the Court"; (2) in addition to the sums paid by plaintiff to defendant pursuant to the settlement agreement "Plaintiff shall pay to Defendant $50.00 per month as reimbursement for her transportation expenses to her graduate training and the full amount of the second mortgage on the [marital] premises" in Wyckoff "which presently is $112.00 per month." and (3) "Plaintiff shall provide a used car for *90 Defendant which shall be not later than a 1972 model with a one-year warranty." Defendant thereupon filed an amended notice of appeal bringing up for review the July, 1977 restraint on her renting out the Wyckoff premises and denial of her application for counsel fees, and additionally, the restraint on her removal of the children to Manhattan for the period of her graduate study at the New School for Social Research.
We direct our attention first to the trial court's restraint on defendant's renting out the Wyckoff premises. In each of the two post-divorce proceedings, i.e., at the hearing on plaintiff's motion and at the later plenary hearing, the trial judge found that the parties had intended by their settlement agreement to restrict Mrs. Middlekauff's and the children's residence to the Wyckoff marital premises. The trial judge at the earlier hearing additionally expressed the feeling that by paragraph 4.6 of the agreement, above quoted, the parties intended to permit only short-term rentals, such as might be needed to finance a vacation. As we previously indicated, the trial judge at the plenary hearing found a "general intention of the parties that Mrs. Middlekauff should remain in Wyckoff with the children." We are thoroughly satisfied that in each instance "the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction * * *." State v. Johnson, 42 N.J. 146, 162 (1964). Here, not only is there a "manifest lack of inherently credible evidence to support the finding[s]," id., but, to the contrary, the plain terms of the settlement agreement and the testimony of the parties in regard thereto say otherwise. By paragraph 4.6 of the agreement Mrs. Middlekauff undertook to "maintain the marital premises and not allow waste during the period of joint ownership with the Husband," and was to have "all right, title and interest in and to any rents received from said marital premises during her period of occupancy." There is nothing in the agreement prohibiting *91 the wife from moving out of the Wyckoff residence at any time. Paragraph 4.2 above-quoted provides that she "may continue to reside in said premises * * *." Mrs. Middlekauff testified at the plenary hearing that in a preliminary draft of the agreement the clause read, "[T]he wife shall continue to reside" in the premises, but
I said no, that isn't my understanding and I changed the word shall to may so that it would be fairly clear about what I thought we were doing here.
The settlement agreement does not prevent a temporary renting out of the Wyckoff premises by Mrs. Middlekauff. Nor is any condition imposed requiring the consent of her former husband thereto. Mrs. Middlekauff testified at the plenary hearing that she had no other source of income other than the alimony, and that she needed the rental money to help finance her graduate study and move to Manhattan. At the same hearing Mr. Middlekauff's testimony regarding his understanding of the rent clause in paragraph 4.6 of the settlement agreement, which he gave at the February 15, 1977 hearing in the divorce proceeding, was read in evidence.[3] He had been asked on cross-examination:
Q And the [settlement] agreement also states that if the marital residence is rented for any period of time while your wife has the right to occupancy she will have the right to those rents?
He responded: "Yes."
We discern nothing in the settlement agreement to prevent Mrs. Middlekauff from renting out the Wyckoff premises for all or any part of the duration of her graduate studies at the New School, retaining for her benefit all rents received from any rental arrangement. We so hold.
*92 We further hold that, in the totality of the circumstances disclosed in the record, the trial judge erred in not permitting Mrs. Middlekauff to relocate with the children in Manhattan for the duration of her graduate studies at the New School for Social Research. The single remark made by the trial judge on the subject at the plenary hearing was:
I can't conceive of that environment in New York City of 27th Street and Second Avenue would be as conducive to the welfare of the children as it is living in one of our Bergen County suburbs, namely Wyckoff. Therefore, for that reason, I will sign an order directing Mrs. Middlekauff to remain in Wyckoff.
Such a statement and determination are clearly not in keeping with the applicable statutory and decisional law. See N.J.S.A. 9:2-2 and D'Onofrio v. D'Onofrio, 144 N.J. Super. 200 (Ch. Div. 1976), aff'd 144 N.J. Super. 352 (App. Div. 1976)[4].
In D'Onofrio the trial court had before it the issue of allowing the custodial parent, the defendant mother, to remove her infant children, a boy of six and a girl of four, to South Carolina for purposes of establishing permanent residency there. The father of the children had obtained a no-fault divorce from Mrs. D'Onofrio by a judgment which granted her custody of the children subject to his right of "reasonable visitation." In granting the mother's application over the objection of the children's father. Judge Pressler properly noted that:
* * * when our courts speak of the "cause shown" criterion of N.J.S.A. 9:2-2[5] in terms of the best interests and welfare of the child, *93 they speak, as a matter of content, not to the whole range of considerations which must be taken into account in deciding which of the parents shall have custody. They speak rather to one aspect of the child's welfare, namely his interest in continuing, by appropriate visitation, as reasonable, healthy and affectionate a relationship as possible with the parent with whom he does not reside. [144 N.J. Super. at 205]
Other observations by Judge Pressler are particularly pertinent here. Thus,
The children, after the parents' divorce or separation, belong to a different family unit then [sic] they did when the parents lived together. The new family unit consists only of the children and the custodial parent, and what is advantageous to that unit as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interests of the children. It is in the context of what is best for that family unit that the precise nature and terms of visitation and changes in visitation by the noncustodial parent must be considered. [at 206]

* * * * * * * *
The court should not insist that the advantages of the move [out of the jurisdiction] be sacrificed and the opportunity for a better and more comfortable life style for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial. [at 207]

* * * * * * * *
It is further clear that a noncustodial parent is perfectly free to remove himself from this jurisdiction despite the continued residency *94 here of his children in order to seek opportunities for a better or different life style for himself. And if he does choose to do so, the custodial parent could hardly hope to restrain him from leaving this State on the ground that his removal will either deprive the children of the paternal relationship or depreciate its quality. The custodial parent, who bears the essential burden and responsibility for the children, is clearly entitled to the same option to seek a better life for herself and the children, particularly where the exercise of that option appears to be truly advantageous to their interests and provided that the paternal interest can continue to be accommodated, even if by a different visitation arrangement than theretofore. [at 207-208]
It is clear from the record before us that Mrs. Middlekauff has convincingly demonstrated the required "cause," and we are entirely satisfied that her proposed relocation with the children would be best for the post-divorce family unit, and, in the particular circumstances, obviously in the best interests of the children, and accordingly should be allowed. She is a college graduate with a bachelor's degree in urban studies, embarking on graduate study to obtain a master's degree in health services administration in order to obtain appropriate employment. In the present posture of the limited and circumscribed alimony provision of the settlement agreement, she will be constrained to obtain employment within two years, i.e., not later than July 1, 1980, in order to support herself and fulfill her obligations regarding maintenance of the former marital premises. Recognizing this, she decided, after investigation, "that health services was going to be a very worthwhile and rewarding area to pursue." Her graduate work at the New School requires her to be at the school two full days and part of a third day each week. Additionally, she will be required to undertake an internship program "to be worked out with a placement officer at school." She has, with the school's understanding and consideration, been allowed to arrange a school schedule around the children's hours, affording her more time to be with them. She testified "if they do continue with the schedule that I saw, I can be out of school just about the time * * * [the younger son] gets out of school." In the *95 opinion of the probation officer who reported to the trial court, Mrs. Middlekauff approached the relocation with her sons to Manhattan "with a lot of thought in mind in regard to going to the [N]ew [S]chool and the area in question."[6]
Defendant has no source of income other than the alimony. It appears that the house in Wyckoff can be rented for about $700 a month while the monthly rent on the prospective six-room apartment in Manhattan would be $516, inclusive of utilities. Mrs. Middlekauff points out that she cannot afford the tuition for her graduate training without the addition to her income which she would receive from renting out the Wyckoff house;[7] that "the cost and the time used in commuting [between Wyckoff and Manhattan] are impossible for [her] to handle," and that she needs to be home to supervise her children after school.
The prospective six-room Manhattan apartment includes three bedrooms. Mrs. Middlekauff emphasized that this would allow each of the boys to have his own separate room, thus enabling them "to still maintain the privacy and respect for each other's space that we have tried to maintain in the [Wyckoff] home." It is obvious from the record that she planned the proposed relocation with considerable thought and concern for the boys' welfare. There are pedestrian malls and children's play areas within the housing complex. There is a Boys' Club on 29th Street near the apartment building, with an active program including theatre, workshop, photography, sports, and swimming pool, organized according to age groups. The older son took the competitive *96 examination for and was accepted at Stuyvesant High School, which is within about 15 minutes' walking distance from the apartment. The younger son will be attending a a neighborhood elementary school located within 10 to 12 minutes' walking distance. Mrs. Middlekauff also indicated that she had spoken with "a retired woman friend who lives in the corner building" at the housing complex and who "has volunteered to be available for emergencies for the boys if they need the key or if they need to telephone somebody or anything comes up where they need help." Although the trial judge spoke to the boys in chambers, he commented that he was "not going to be too influenced, if at all, by [his] conversation with the two young men." It is clearly apparent from the record that, as counsel for amici curiae observes, "their [the boys'] clear preference was to move with their mother to New York City."
Mr. Middlekauff lives in Wayne Township, a 15-minute drive from the Wyckoff home. It takes an additional 45 minutes to get to the proposed Manhattan apartment building. It appears that at the time of the plenary hearing his visitation with the children was on the weekends, i.e., on a Sunday one week and on Saturday and Sunday the next week.[8] Hopefully, he will be able to make appropriate *97 arrangements to accommodate his sons even though these visits will entail an additional 45 minute drive each way. Having conditioned his payment of alimony upon Mrs. Middlekauff's continuance in the New School graduate program, he can hardly complain of having to drive to Manhattan on weekends while expecting her to do so several times each week with a resulting loss to the children of many hours of her supervision and companionship.
In summary, we hold that (1) Mrs. Middlekauff may, in her sole discretion, rent out the Wyckoff premises for all or any part of the duration of her graduate studies at the New School for Social Research, retaining for her benefit all rents received from any rental arrangement; (2) her relocation with the children to Manhattan for the duration of her graduate studies is allowed, the same being, in the totality of the circumstances, best for the post-divorce family unit and in the best interests of the children of the marriage. In light of these holdings, the provision in the September 12, 1977 order of the trial court requiring plaintiff to pay defendant $50 a month "as reimbursement for her transportation expenses to her graduate training" is terminated.
The parts of the orders appealed from, as set forth in the amended notice of appeal dated September 22, 1977, are reversed and the matter is remanded to the trial court for the entry forthwith of an appropriate order consistent with our holdings and determination herein.
One additional issue requires our attention.[9] The trial judge who heard plaintiff's motion denied Mrs. Middlekauff's *98 application for a counsel fee "on account of" that motion without comment. The trial judge at the post-divorce plenary hearing made no determination on her further application for "counsel fees and costs for litigating" the issues at that hearing.
Under our practice, the award of counsel fees and costs in a matrimonial action rests in the discretion of the court. * * * In deciding whether a wife is entitled to counsel fees and costs, our courts focus on several factors, including the wife's need, the husband's financial ability to pay and the wife's good faith in instituting or defending the action. * * * Those factors being met, it is the policy of our law that counsel fees and costs in matrimonial actions are properly the obligation of the husband and he should be compelled to furnish them to the wife.
[Williams v. Williams, 59 N.J. 229, 233 (1971)]
See also, Lavene v. Lavene, 148 N.J. Super. 267, 276-277 (App. Div. 1977), certif. den. 75 N.J. 28 (1977). It is obvious from our discussion of the issues that Mrs. Middlekauff acted entirely in good faith in defending against plaintiff's motion and in applying for the subsequent plenary hearing and litigating the issues thereat. However, neither trial judge made any finding as to Mrs. Middlekauff's need or her former husband's financial ability to pay. The issue of counsel fees and costs will, accordingly, be remanded to the trial court for its further consideration, the trial judge to support his determination with express findings as to the respective need of defendant and financial ability of plaintiff. We do not retain jurisdiction in regard thereto. Defendant's application for counsel fees and costs on this appeal will be determined on appropriate motion therefor.
NOTES
[1] The record does not indicate the dates of birth of the children.
[2] The payment to the wife "of $1,083.00 per month as alimony [to] continue until the Wife's remarriage, her death, or until July 1, 1980, whichever event shall first occur; provided that the Wife is accepted and continues in the New School masters or its equivalent program for a graduate degree in Public Health Administration." [Par. 2.1].

Upon the occurrence of any of the above referred to events, the Husband's obligation for alimony as set forth in paragraph 2.1 hereof shall cease, and he shall thereafter pay to the Wife, on the 1st day of each month, the sum of $300.00 per month per child, for the support and maintenance of the two children of the marriage, until their emancipation as hereinafter defined. [Par. 2.2].
[3] And, the transcript of the hearing was admitted in evidence.
[4] N.J.S.A. 9:2-4 is not particularly implicated in the issue presently before us since it has already been properly determined by the trial court that the mother should have custody of the children for their best welfare.
[5] N.J.S.A. 9:2-2 provides:

When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order. The court, upon application of any person in behalf of such minors, may require such security and issue such writs and processes as shall be deemed proper to effect the purposes of this section.
In light of our disposition of this appeal, and for reasons expressed in D'Onofrio, supra, see 144 N.J. Super. at 208, n. 1, we find no need to reach the constitutional issues raised by defendant and amici curiae.
[6] Upon being asked by the trial judge for his personal opinion, the probation officer said that when he was 8 or 14 years old he thinks he would have preferred living in Wyckoff.
[7] Mrs. Middlekauff testified that the day graduate program in which she was accepted is a 58 credit program at a charge of $120 per credit.

We note here that the settlement agreement conditions the payment of alimony upon Mrs. Middlekauff's continuance with her graduate studies at the New School.
[8] He was asked what hardships he would encounter, as to visitation, if Mrs. Middlekauff was successful in removing the children to New York City. He answered:

"It is an hour's drive back and forth from Wayne to New York and I certainly don't want those kids to be subjected to the subway system. There is too much going on in the subways."
He was then asked whether he would be able to visit with the children during the week in the event they lived in New York. He answered:
"How could I? I have a very demanding job as it is. I travel overseas frequently. I can't see them that often."
It appears, however, that at the time, Mr. Middlekauff was not visiting with the children on weekdays in any case.
[9] We have not overlooked the possibility that defendant's completion of her graduate studies by July 1, 1980 may be delayed as a result of the post-divorce litigation instituted by plaintiff. Should this be demonstrated to the trial court by defendant, after hearing on appropriate application and notice to plaintiff, the alimony provision of the settlement agreement should be extended to cover the period of the delay.